UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| MARGARET P. RUSSELL | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | NO. 1:05-CV-250 |
| | ) | EDGAR/CARTER |
| JO ANNE B. BARNHART | ) | |
| Commissioner of Social Security | ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of the plaintiff's Motion for Judgment on the Pleadings (Doc. 11) and defendant's Motion for Summary Judgment (Doc. 13).

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying the plaintiff a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423.

It is RECOMMENDED the decision of the Commissioner be AFFIRMED.

. ## Plaintiff's Age, Education, and Past Work Experience

The plaintiff was born on March 27, 1943, and was 58 years old at the time of the ALJ's decision (Tr. 14, 62). She has an eighth grade education (Tr. 67). The plaintiff has past relevant work as a hand packager, classified as medium unskilled work (Tr. 14). She alleges disability based upon degenerative disc disease (Tr. 32, 34).

## Claim for Benefits

On October 16, 2002, the plaintiff filed applications for a period of disability and disability insurance benefits with an alleged onset date of March 1, 2002 (Tr. 48-50).  The claim was denied initially and upon reconsideration (Tr. 32-38).  On February 17, 2004, Plaintiff, who was unrepresented, appeared before Administrative Law Judge (ALJ) Bernard O'Brien (Tr. 274-286).  On September 8, 2004, ALJ O'Brien determined that plaintiff was not disabled because she could perform her past relevant work as a hand packager (Tr. 18-19).  Plaintiff requested judicial review, but on July 19, 2005, the Appeals Council denied her request (Tr. 4-6), rendering the ALJ's decision the Commissioner's final decision in this matter (Tr. 14-19).  This matter is now ripe for judicial review.  *See* 42 U.S.C. § 405(g).

<u>Standard of Review - Findings of the ALJ</u>

To establish disability under the Social Security Act, a claimant must establish she is unable to engage in any substantial gainful activity due to the existence of "a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); <u>Abbot v. Sullivan</u>, 905 F.2d 918, 923 (6th Cir. 1990).  The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled.  20 C.F.R. § 404.1520.  The following five issues are addressed in order:  (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled.  <u>Id</u>.  If the

ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step.  20 C.F.R. § 404.1520; Skinner v. Secretary of Health & Human Servs., 902 F.2d 447, 449-50 (6th Cir. 1990).          Once, however, the plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience.  Richardson v. Secretary, Health and Human Servs., 735 F.2d 962, 964 (6th Cir. 1984); Noe v. Weinberger, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); Landsaw v. Secretary, Health and Human Servs., 803 F.2d 211, 213 (6th Cir. 1986).  Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed.  Ross v. Richardson, 440 F.2d 690, 691 (6th Cir. 1971).  The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion.  The substantial evidence standard allows considerable latitude to administrative decision makers.  It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts.  Felisky v. Bowen, 35 F.3d 1027 (6th Cir. 1994) (citing Mullen v. Bowen, 800 F.2d 535, 548 (6th Cir. 1986)); Crisp v. Secretary, Health and Human Servs., 790 F.2d 450 n. 4 (6th Cir. 1986).

After considering the entire record, the ALJ made the following findings:

1.  The claimant meets the disability insured status requirements of the Act at least through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since March 1,

2002.

3.  The claimant has "severe" impairments, as described in the decision, but does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.  The claimant's subjective complaints, including pain, are not fully credible.

5.  The claimant has the residual functional capacity to perform medium work activity.

6.  The claimant's limitations would not prevent the claimant from performing past relevant work as a hand packager.

7.  The claimant has not been under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 18, 19).

## Issues Raised

Plaintiff seeks reversal or remand asserting the following errors:

1.  The Commissioner erred in assigning little weight to the opinion of plaintiff's treating physician.

2.  The Commissioner erred in finding that plaintiff's subjective complaints, including pain, were not fully credible.

3.  The Commissioner erred in finding that plaintiff was capable of medium work and could perform her past relevant work.

## Relevant Facts

### Medical Evidence

An accident/injury report dated September 13, 2001, stated that plaintiff severely strained and injured her back (Tr. 107). She saw Dr. Hutcheson and she underwent an MRI that showed disc problems at two levels. Dr. Killeffer had assigned plaintiff an impairment rating of 5%, and Dr. Gibson assigned her an impairment rating of 34%. Another physician, Richard Sharpe, M.D.

diagnosed back strain, as well as back pain (id.).

Plaintiff saw her regular family physician, Vickie A. Turnbough, M.D. on October 22, 2001 (Tr. 135). This report said nothing about a back injury occurring on September 13, 2001 (id.).

On October 18, 2001, plaintiff saw Dr. Hutcheson for complaints of low back pain that radiated down both of her legs (Tr. 244).[1] Dr. Hutcheson noted that after plaintiff injured her back at work on September 13, 2001, she saw Dr. Sharp who placed her on a muscle relaxer and sent her to physical therapy. Plaintiff had four sessions of physical therapy, but reported that the therapy did not help a whole lot (id.). However, after conducting a physical examination that produced basically normal findings, Dr. Hutcheson recommended at least two more weeks of physical therapy and prescribed the medications Mobic and Darvocet (Tr. 245). Dr. Hutcheson also wanted plaintiff to continue her normal duties at work (id.).

On October 29, 2001, Dr. Turnbough commented that plaintiff had seen an orthopedist (Dr. Hutcheson) who placed her on two medications (Mobic and Darvocet) for back pain (Tr. 134). Dr. Turnbough reported that both medications had helped Ms. Russell (id.).

On November 6, 2001, plaintiff saw Dr. Hutcheson for a follow-up visit (Tr. 243). She registered the same complaints as in her previous visit (back pain radiating down her legs) and said that she was not sure if physical therapy was helping her, because she was having a lot of pain. Dr. Hutcheson wanted to set plaintiff up for a lumbar epidural steroid injection. Dr. Hutcheson asked plaintiff to continue with her current work restrictions, which allowed her extra

_____

[1] *Dr. Hutcheson's treatment relationship with plaintiff dates back to at least May 18, 1999 (Tr. 246).*

time on her breaks (id.).  On December 13, 2001, plaintiff told Dr. Hutcheson that the epidural injection helped somewhat, but she also reported that the pain had returned (Tr. 242).  Dr. Hutcheson suggested one more epidural injection, but commented that if the injection did not work, he did not know what he could offer to her.  Dr. Hutcheson did not think that surgery would help plaintiff.  Dr. Hutcheson noted that plaintiff's current work restrictions included applying ice to her back throughout the work day (id.).

On January 9, 2002, Darin Wilbourn, M.D. provided a L5/S1 epidural injection for plaintiff  (Tr. 241).

On January 22, 2002, plaintiff  told Dr. Turnbough that the medication Mobic was no longer helping to relieve her back pain (id.).

Plaintiff also saw Dr. Hutcheson on January 22, 2002 (Tr. 240).  On examination, Dr. Hutcheson found some pain in her low back area.  She had negative results on the straight leg raising tests and normal (5/5) motor strength.  Dr. Hutcheson noted that since September 2001, treatment had consisted of two epidural injections and physical therapy.  Dr. Hutcheson commented that he really had nothing else to offer to Ms. Russell and that she was just going to have to live with her back pain.  Thus, he put plaintiff at maximum medical improvement (MMI) and returned her to normal duties at work (id.).

On April 1, 2002, plaintiff  saw James Killeffer, M.D. for a neurosurgical consultation, with a chief complaint of leg pain (Tr. 116).  Dr. Killeffer reviewed a lumbar spine  MRI from October 3, 2001, and noted that it revealed disc herniation at L5-S1 "eccentric to the left" (Tr. 117).  Dr. Killeffer also reported degenerative changes at L4-5.  Under the heading "Impression/Plan," Dr. Killeffer wondered why a person with lumbar disc herniation and pain as

the result of a work injury did not have an impairment rating.  Dr. Killeffer also observed plaintiff had some signs of symptom magnification.  He would consider surgery, but Dr. Killeffer wanted to obtain an updated MRI before proceeding.  As of this examination, Dr. Killeffer opined plaintiff could return to work "on a relatively sedentary basis with no lifting greater than 30 pounds and the ability to sit or stand as needed" (id.).

On April 12, 2002, F. Gregory Curtin, M.D., reviewed the MRI of plaintiff's lumbar spine (Tr. 254).  Dr. Curtin found a broad based midline protrusion at L5-S1 that resulted in effacement of the thecal sac.  The protrusion did not cause any spinal stenosis, foraminal narrowing, or nerve root displacement.  The study did reveal mild degenerative facet changes at the L5-S1 level on the right (id.).

When Dr. Killeffer saw plaintiff  for a follow-up on April 22, 2002, she brought the updated (4/12/02) MRI scan with her (Tr. 115).  The updated MRI continued to reveal degenerative changes, but did not reveal a residual herniated disc (id.).  Dr. Killeffer commented that he could not do anything for plaintiff.  He also noted that plaintiff "doesn't want to return to any kind of work at all."  He observed that she had persistent back pain, but no overt radiculopathy.  Dr. Killeffer reiterated that he did not think plaintiff had a significant ruptured disc.  He assigned plaintiff a 5% impairment rating to the whole person, and opined that she had reached maximum medical improvement (MMI) (id.).

On April 23, 2002, plaintiff saw Dr. Turnbough and told her that "Dr. Keebler" (probably Dr. Killeffer) had recommended that she have a complete physical examination for her back discomfort (Tr. 132).  Although other reports stated that plaintiff  had stopped working in late February or early March 2002, she told Dr. Turnbough that she continued to have lower back

pain and discomfort that worsened when working (id.).

Dr. Turnbough performed the complete physical examination on May 30, 2002 (Tr. 130-31). She listed impressions of gastro-esophageal reflux disease, hypercholesterolemia, and hypothyroidism (Tr. 131).

On July 1, 2002, Donald B. Gibson, M.D., sent a letter to an attorney concerning plaintiff (Tr. 118-24). Dr. Gibson stated that he examined plaintiff on June 18, 2002, in relation to the injury she suffered at work on September 13, 2001. After the injury, Ms. Russell saw Dr. Sharp twice (Tr. 119). Dr. Sharp then referred plaintiff to Dr. Hutcheson. Dr. Hutcheson saw plaintiff several times and referred her for two epidural injections to her lumbar spine performed by Dr. Wilbourn. Plaintiff told Dr. Gibson that the injections did not help her, but she continued on her job. Dr. Gibson's only comment about Dr. Killeffer was to note that he assigned her the 5% whole person rating (id.). Plaintiff told Dr. Gibson that she stopped working around February 28, 2002 when she found that she could not stand up straight or perform her job duties (Tr. 120).

Dr. Gibson also reviewed some less recent history, noting that plaintiff's regular physician, Dr. Vickie Turnbough, had referred her for MRIs of her hip and back in 1997 (Tr. 120). The lumbar spine MRI showed degenerative changes and a small herniated disc without nerve root impingement. The MRI of the hip produced normal results. Another physician, Dr. Voytik, had also treated plaintiff in 1997 and gave her an epidural injection at that time. Dr. Gibson reported plaintiff's current complaints as including chronic back pain and numbness in her legs. She told Dr. Gibson that she had trouble getting up and down, and moving about. Plaintiff took 800 mg of Ibuprofen every twelve hours and reported that the medication helped her somewhat (id.).

8

Dr. Gibson's physical examination revealed palpable paralumbar muscle spasm with tenderness, greater on the left side of plaintiff's lumbar spine (Tr. 121). Her hip motions were about 50% of normal (id.). Dr. Gibson opined that plaintiff was not able to continue to perform manual labor (Tr. 123). Thus, she could not continue to perform the job that she had performed in the past. Dr. Gibson then assigned plaintiff a 34% whole person impairment (id.).

On July 10, 2002, Dr. Turnbough saw plaintiff for complaints of abdominal cramping and pain in her lower abdomen (Tr. 129). Plaintiff saw Dr. Turnbough again on September 25, 2002 (Tr. 128). This report too said nothing about back pain.

On October 17, 2002, a bone density study showed plaintiff's bone strength was within the normal range (Tr. 258).

On January 7, 2003, a state agency physician reviewed the record, and opined that plaintiff could lift fifty pounds on an occasional basis, and up to twenty-five pounds on a frequent basis (Tr. 226). The physician referred to the examinations by Dr. Killeffer and the October 2001, and April 2002, MRI examinations (Tr. 226-27). The reviewing physician noted that the record did not contain a treating or examining source statement regarding plaintiff's physical capacities (Tr. 231).

Another state agency physician, Jas P. Lester, M.D. reviewed the record on April 17, 2003 (Tr. 233-38). This physician, too, set out a residual functional capacity (RFC) for plaintiff that was consistent with medium work (lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk about six hours in an eight hour day) (Tr. 234). Dr. Lester, however, commented that the record did contain a statement from a treating source about plaintiff's capabilities, that differed significantly from the findings in Dr. Lester's assessment (Tr. 238).

When asked to explain the discrepancy, Dr. Lester commented that the treating source had reported multiple positive Waddells signs, despite only minor degenerative changes on the MRIs of plaintiff's lumbar spine. Similarly, Dr. Lester noted that physical examinations had shown that plaintiff walked with a normal gait, had normal strength, and was totally intact neurologically. Thus, Dr. Lester concluded that plaintiff's allegations were inconsistent with the objective findings (id.).

On May 21, 2003, plaintiff saw Dr. Turnbough, complained of low back discomfort, and asked for an increase in the strength of her pain medications (Tr. 256).

On August 12, 2003, Dr. Hutcheson noted that he was seeing plaintiff for the first time since January 22, 2002 (Tr. 239). Dr. Hutcheson reported physical findings that included an ability for plaintiff to flex forward her fingertips to just above knee level. Thus, Dr. Hutcheson commented, "I feel like there is significant symptom magnification here; otherwise the exam is unremarkable." Dr. Hutcheson reviewed the MRI from April 2002, and said he saw a little disc bulging at L5-S1. Otherwise, the MRI had produced unremarkable results (id.).

On August 18, 2003, plaintiff saw Dr. Turnbough and reported that neither she nor her husband had health insurance (Tr. 255).

On September 3, 2003, Dr. Turnbough filled out a "Medical Source Statement of Ability To Do Work-Related Activities" (Physical) (Tr. 259-62) and limited plaintiff to sedentary work (lifting less than ten pounds, limited to standing and walking less than two hours each day).

Plaintiff's administrative hearing took place on February 17, 2004, and, as noted, the ALJ stated that he would refer plaintiff for a consultative orthopedic examination (Tr. 281). Honoring plaintiff's request that she not be referred to Dr. Hutcheson, the ALJ referred her to

Stephen King, M.D. (Tr. 263-70).

Dr. King saw plaintiff on April 24, 2004 (Tr. 263). In his report, Dr. King discussed the difficulty that he experienced trying to get plaintiff to participate in her physical examination (Tr. 264). For example, she would not toe walk, heel walk, or perform a deep knee bend (id.). Dr. King reported plaintiff had significant Waddell's signs, which, he explained, were indicative of non-organic causes of back pain (Tr. 265). Dr. King also stated that when he was not examining plaintiff he observed as she walked to her car in the parking lot, and her gait improved significantly and she got into the car with ease (id.). Dr. King opined that plaintiff could lift fifty pounds occasionally and up to twenty-five pounds more frequently. She could stand and walk for six hours in an eight-hour day. She could tolerate sitting and her ability for pushing and pulling was unlimited (id.).

<u>Analysis</u>

1. Did the Commissioner err in assigning little weight to the opinion of plaintiff's treating physician?

Plaintiff argues that the ALJ erred in assigning little weight to the opinions of her treating physician, Dr. Turnbough. Plaintiff's Brief at 3, 4, 5. In this case, there are two physicians who have had a long term treating relationship with plaintiff. As pointed out in her brief, Dr. Turnbough has treated plaintiff since April 9, 1997. Plaintiff's Brief at 2. However, Dr. Hutcheson's relationship with plaintiff also constitutes a long term treating relationship, as it dates back to at least May 18, 1999 (Tr. 246). In addition, after plaintiff suffered her allegedly disabling injury in September 2001, the medical records very clearly demonstrate that it was Dr. Hutcheson, not Dr. Turnbough, who actually provided treatment.

It is well settled that opinions of treating physicians, because of their longitudinal history

11

of caring for patients, are entitled to great weight and are generally entitled to greater weight than contrary opinions of consulting physicians who have examined plaintiffs only once. Walters v. Commissioner of Social Security, 127 F.3d 525, 529-30 (6th Cir. 1997); Ferris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985); Harris v. Heckler, 776 F.2d 431, 435 (6th Cir. 1985). See also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.") The rationale for this weight given to a treating physician's opinion is set forth in the Commissioner's regulations:

> Generally, we give more weight to opinions from your treating sources, since these sources are more likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

However, a treating physician's opinion is not entitled to controlling weight, and may be given little weight, if it is inconsistent with other substantial evidence or is not well-supported by the objective medical evidence. Cutlip v. Secretary of Health & Human Servs., 25 F.3d 284, 287 (6th Cir. 1994). The Sixth Circuit has made clear that "the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified." Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988) (holding that the ALJ properly gave no deference to treating physician's opinion that was not supported by objective medical evidence). I agree with the Commissioner's that here, Dr.

Turnbough's assessments on the nature and severity of Plaintiff's conditions were not entitled to controlling weight because they were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2).

The regulations, specifically, 20 C.F.R. § 404.1527, set out the factors for evaluating opinion evidence. One of the regulations subsections, 20 C.F.R. § 404.1527(d)(2)(ii), states that the agency must look at the treatment that the source has provided, and the kind and extent of the examinations that the source has performed or ordered from specialists. As noted, plaintiff complained of an injury to her back that occurred at work on September 13, 2001. She saw Dr. Turnbough on October 22, 2001, but the examination did not even mention back problems (Tr. 135). In contrast, plaintiff saw Dr. Hutcheson just three days earlier, on October 18, 2001, and that examination focused exclusively on her complaints of back pain (Tr. 244). On October 18, 2001, Dr. Hutcheson prescribed Mobic and Darvocet (id.). On October 29, 2001, Dr. Turnbough noted that an orthopedic physician had prescribed Darvocet and Mobic for plaintiff. It appears from these reports that Dr. Hutcheson was the treating physician for plaintiff's back problems.

The ALJ noted that Dr. Hutcheson's treatment of plaintiff pre-dated the September 2001 injury (Tr. 16). The ALJ correctly observed that Dr. Hutcheson returned plaintiff to work without restrictions in January 2002 (Tr. 16, 240). Plaintiff contends that the Court should accept the opinions that Dr. Turnbough set out on a physical capacities form dated September 3, 2003 (Tr. 259-62). However, Dr. Hutcheson saw plaintiff on August 12, 2003, and discussed a physical examination that produced unremarkable results (Tr. 239). Dr. Hutcheson's impression was chronic low back pain and symptom magnification. Dr. Hutcheson did not see any reason to

13

change his previous comments about plaintiff. Thus, as argued by the Commissioner, Dr. Hutcheson and Dr. Turnbough both had long term treatment relationships with plaintiff. Furthermore, Dr. Hutcheson, an orthopedic specialist, treated the condition that plaintiff has identified as disabling, her back condition. Dr. Hutcheson did not see the back condition as causing significant work restrictions. The ALJ accepted that opinion (Tr. 16). The ALJ, then, followed the opinion of a treating physician who had a long term treatment relationship with plaintiff and actually treated the condition that she alleged as disabling.

In addition, the regulations specify that the opinion of a specialist is usually accepted over that of a non-specialist. Dr. Hutcheson was an orthopedic surgeon, who, as noted, specifically treated plaintiff's back condition. Thus, 20 C.F.R. § 404/1527(d)(5) (specialization) also supports accepting Dr. Hutcheson's opinions over those of non-specialist, family physician, Dr. Turnbough.

Another factor set out in the regulations that is important in determining the weight to be given to a physician opinion is its consistency. *See* 20 C.F.R. § 404.1527(d)(4) (generally the more consistent an opinion is with the record as a whole, the more weight the agency will give to that opinion). In addition to Dr. Hutcheson's opinion, the ALJ could rely upon the opinions of two state agency physicians and the opinion of consultative examiner Dr. King. The latter, like the two state agency physicians, opined that plaintiff could lift fifty pounds occasionally, and at least twenty-five pounds frequently (Tr. 267, compare Tr. 226 and Tr. 234). In addition, Dr. Killeffer thought plaintiff could lift up to thirty pounds (Tr. 117). Thus, Dr. Turnbough's opinion that plaintiff could not lift ten pounds (Tr. 259), was inconsistent with at least four physician opinions of record.

2. Did the Commissioner err in finding that plaintiff's subjective complaints, including pain, were not fully credible?

Plaintiff has asserted that the ALJ's focus on her activities "is insufficient for rejecting a claimant's complaints of pain." Plaintiff's Brief at 6. Plaintiff complained of severe pain in her lower back spreading to her hips and legs. Only pain relievers, sitting and resting relieve the pain (Tr. 74). Plaintiff asserts she occasionally has pain that runs up her back and into her shoulders. She wears a lower back brace, but asserts she cannot work because of pain (Tr. 75). She complains of difficulty walking very far, standing very long, and has trouble doing her house work (Tr. 87, 282-83). She stated "all I can tell you is that it really does hurt, and the numbness is awful" (Tr. 87).

A claimant's statement that he/she is experiencing disabling pain or other symptoms will not, taken alone, establish he/she is disabled. 20 C.F.R. §§ 404.1529(a) and 416.929(a). One must first use a two-pronged analysis requiring some degree of objective medical evidence to evaluate a claimant's assertions of disabling pain:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

Felisky v. Bowen, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (quoting Duncan v. Secretary of Health and Human Servs., 801 F.2d 847, 853 (6th Cir. 1986)); see also, 20 C.F.R. §§ 404.1529(a) and 416.929(a). Objective medical evidence constitutes medical signs and/or laboratory findings as

defined in 20 C.F.R. §§ 404.1528(b)- (c) and 416.929(b)-(c).[2]  20 C.F.R. §§ 404.1529(a) and 416.929(a).

Because pain is primarily a subjective sensation, claimants rarely establish the second prong of the two pronged test by producing objective medical evidence confirming the severity of the alleged pain.  Rather, claimants most often meet the second prong by showing that the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain. Unlike the first option, this second option does not require objective evidence of the *pain itself*.  Duncan, 801 F.2d at 853.  However, once a claimant has produced objective medical evidence that his/her impairment could reasonably be expected to

---

[2] 20 C.F.R. § 404.1528 provides:
Symptoms, signs, and laboratory findings.

Medical findings consist of symptoms, signs, and laboratory findings:

(a) Symptoms are your own description of your physical or mental impairment. Your statements alone are not enough to establish that there is a physical or mental impairment.

(b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

(c) Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests.

*See also* 20 C.F.R. § 416.928 for the same definitions as to SSI.

produce the pain alleged, the inquiry does not stop there.  The Commissioner must then consider

other evidence to evaluate the *actual* severity of the claimant's pain:

> The finding that your impairment(s) could reasonably be expected to produce
> your pain or other symptoms does not involve a determination as to the intensity,
> persistence, or functionally limiting effects of your symptoms.

20 C.F.R. §§ 404.1529(b) and 416.929(b).

> When the medical signs or laboratory findings show that you have a medically
> determinable impairment(s) that could reasonably be expected to produce your
> symptoms, such as pain, we must then evaluate the intensity and persistence of
> your symptoms so that we can determine how your symptoms limit your capacity
> for work.

20 C.F.R. §§ 404.1529(c)(1) and 416.929(c)(1).  Other evidence aside from medical signs and

laboratory findings include the claimant's medical history, statements by treating physicians,

medications taken, medical treatment other than medication received to relieve pain or other

symptoms, methods the claimant has used to relieve pain, precipitating and aggravating factors,

daily activities, and statements by the claimant.  20 C.F.R. §§ 404.1529(c) and 416.929(c).  The

ALJ shall also consider the credibility of the plaintiff's statements about his/her pain.  Kirk v.

Secretary of Health and Human Services, 667 F.2d 524, 538 (6th Cir. 1981); *see also* 20 C.F.R.

§§ 404.1529(c)(4) and 416.929(c)(4).  In so doing, the ALJ shall consider, among other things,

whether there are any inconsistencies between the claimant's statements and the rest of the

evidence including but not limited to medical signs and laboratory findings, physicians'

statements, and the claimant's activities.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4).

Because the ALJ is charged with the responsibility of observing the demeanor and credibility of

the witness, his conclusions should be highly regarded.  Walters v. Commissioner of Social

Security, 127 F.3d 525, 530 (6th Cir. 1997); Villarreal v. Secretary of Health and Human

Services, 818 F.2d 461, 463 (6th Cir. 1987).

In his opinion, the ALJ discusses his reasons for finding plaintiff's allegations of pain not credible:

> The claimant alleges severely restricted daily activities as a result of her pain, i.e., inability to sit for long periods, walk very far, stand for more than an hour, drive far, walk up stairs, and arise from a chair without assistance. (Exhibits 3E, 6E, and 14E).

Tr. 18.

While activities play a role in any credibility determination, the ALJ also knew what the physicians themselves said about the credibility of plaintiff's subjective complaints and specifically mentions symptom magnification as a basis for rejecting the allegations of pain. In this case, three physicians who examined plaintiff talked about significant symptom magnification. On April 1, 2002, Dr. Killeffer noted that plaintiff had "some signs of symptomatic magnification on my exam" (Tr. 117). In a subsequent examination, Dr. Killeffer questioned plaintiff's motivation, noting that she did not want to return to any work at all (Tr. 115). On August 12, 2003, Dr. Hutcheson talked about significant symptom magnification (Tr. 239). Dr. King, who saw plaintiff in April 2004, discussed the difficulties that he had in even getting plaintiff to participate in his examination (Tr. 264). For example, plaintiff would not toe walk, heel walk, or perform a deep knee bend (id.). Dr. King reported significant Waddell's signs, which, as he explained, were indicative of non-organic causes of back pain (Tr. 265). Dr. King averred that it was very difficult to correlate plaintiff's physical findings with the MRI findings or with what appeared to be plaintiff's physical findings. Dr. King reported that plaintiff's gait improved considerably once "she got outside of the front door" (id.). When three physicians of record, all of whom examined plaintiff, talk about symptom magnification or lack

of motivation, an ALJ can consider that in finding a claimant less than credible. See Gooch v. Sec'y of Health & Human Servs., 833 F.2d 589, 592 (6th Cir. 1987), cert. denied, 484 U.S. 1075 (1988)) ("The ALJ may have been wrong, but he was not unclear; after listening to what Mr. Gooch said on the witness stand, observing his demeanor, and evaluating that testimony in light of what appears in the written record, the ALJ concluded, rightly or wrongly, that Mr. Gooch was trying to make his symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment. It is a difficult job and the people who perform it sometimes err. Such errors are obviously difficult for a reviewing court to detect, the reviewing court not having seen the claimant in the flesh, and we will not normally substitute our impressions on the veracity of witnesses for those of the trier of fact. We would be particularly reluctant to do so in this case, where there seem to be demonstrable discrepancies between what the claimant said on the stand and what the written record shows."). Here, three doctors noted the discrepancies between what plaintiff said and what their findings showed. The ALJ relied on these discrepancies and plaintiff's activities in making his assessment. I conclude there is substantial evidence in the record to support the ALJ's credibility determination.

3. Did the Commissioner err in finding that plaintiff was capable of medium work and could perform her past relevant work?

As discussed above, the ALJ rejected Dr. Turnbough's opinion in favor of the opinion of long time treating orthopedic specialist, Dr. Hutcheson, and the consultative orthopedic specialist, Dr. King. Furthermore, both of the state agency physicians who evaluated the record determined plaintiff could perform medium work (Tr. 226, 234). Treating physician and orthopedic specialist, Dr. Hutcheson returned plaintiff to work without restrictions on January

22, 2002 (Tr. 240).  Then, when Dr. Hutcheson saw plaintiff again in August 2003, he found no

significant changes from his previous examination, and did not change his opinions about

plaintiff's capabilities (Tr. 239).  Dr. King saw plaintiff in August 2004, and opined that she

could lift fifty pounds occasionally and twenty-five pounds frequently (Tr. 265).  Dr. King found

plaintiff could stand and walk for six hours in an eight hour day and that she could tolerate

sitting.  Thus, Dr. Hutcheson's opinion is consistent with the ALJ's finding that plaintiff  could

perform her past relevant work, and Dr. King's opinion is consistent with an RFC for medium

work.  *See* 20 C.F.R. § 404.1567c, defining medium work.  I conclude these opinions provide

substantial evidence to support the finding of the ALJ that plaintiff can perform medium work.

Conclusion

For the reasons stated herein, I conclude there is substantial evidence to support the

conclusion of the ALJ and I therefore RECOMMEND  the Commissioner's decision be

AFFIRMED.

I further RECOMMEND defendant's Motion for Summary Judgment (Doc. 13) be

GRANTED, and plaintiff's Motion for Judgment on the Pleadings (Doc. 11) be DENIED.[3]


s/William B. Mitchell Carter
UNITED STATES MAGISTRATE JUDGE

---

[3]Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).